# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID M. LUCAS, et al.,<br><br>    Plaintiffs,<br>  vs.<br>JOS. A. BANK CLOTHIERS, INC.,<br><br>    Defendant. | CASE NO. 14cv1631-LAB (JLB)<br><br>**ORDER RE: SANCTIONS** |

David Lucas sued Joseph A. Bank for allegedly inflating suit prices before offering supposed "buy one, get one free" sales. Hassan Zavareei of Tycko & Zavareei and Stuart Scott of Spangenberg Shibley & Liber represented David M. Lucas in this putative class action. Without rehearsing the entire procedural history of the case, suffice it to say that the allegations against Joseph A. Bank fell apart when it became clear to all that Lucas, who had been designated lead plaintiff, had lied about ever buying suits from Joseph A. Bank. Plaintiffs eventually moved to dismiss the case with prejudice, and Joseph A. Bank filed a motion to sanction Lucas and his attorneys for not dismissing the case sooner.

The Court agrees that Lucas's attorneys should have been more diligent and skeptical of Lucas's story much earlier in the litigation. But they didn't act recklessly. And the Court won't stain their reputations for dishonest acts committed by their client . With that said, the Court recognizes that significant time, effort, and money was spent by everyone involved because Lucas attempted to perpetrate a fraud on Joseph A. Bank, this Court, and the public. The Court has determined that Lucas's conduct is sanctionable.

# I. Background

## A. Lucas becomes the class representative.

Lucas learned of the proposed lawsuit against Joseph A. Bank through an online advertisement. He responded to the ad and eventually spoke with an employee at the Spangenberg law firm. The conversation was memorialized in a May 2014 memo. Lucas told a firm representative with whom he first spoke that he remembered buying three suits for about $1,000. He went on to relate that the suits "incurred wear" "within a year." When the Spangenberg associate asked Lucas if he'd be interested in serving as a class representative in a contemplated class action suit against Joseph A. Bank, he enthusiastically responded "YES!" (Ex. A, Tab 1.)

About a month later, Lucas sent Spangenberg an email containing a different account. He now claimed that he had purchased a total of 12 suits from Joseph A. Bank—three suits on four separate occasions. Spangenberg asked for proof, and Lucas emailed them back a document that he described as "the bank statements for the four purchases made with my debit card." What Lucas provided looked like an online banking print-out that had been redacted with black marker. The document showed four debit transactions at Joseph A. Bank occurring in December 2012, June 2013, December 2013, and a fourth transaction with the date redacted. (Ex. A, Tab 2.)

A Spangenberg paralegal followed up with Lucas asking him for the date of the redacted purchase. Lucas told her it was July 1, 2012. The paralegal annotated the alleged bank statement with that date and attempted to otherwise "clean[] up the document" by removing the black marker redactions. Attorney Scott later produced this cleaned-up document to Joseph A. Bank in July 2015, but didn't provide the original that Lucas had sent until August 2016. (Ex. A, Tab 34.)

Scott testified that in his opinion, Lucas seemed like a good fit to be a class representative. Lucas held a Master's degree in accounting, worked for Qualcomm, and was married to a service member in the U.S. Navy. Scott had no reason to suspect that Lucas was lying about buying suits. Scott and Zavareei decided to move forward with Lucas as

their class representative. They filed the lawsuit in July 2014.

**B.    Problems with Lucas's story emerge.**

The parties litigated the action over the next year. In January 2016, Joseph A. Bank deposed Lucas. Lucas testified that he purchased the first three suits in July 2012 from a Joseph A. Bank store in San Diego. He said the suits frayed after he wore them once or twice. Rather than return them to Joseph A. Bank, he donated them to Goodwill. Yet, he testified that a few months later he bought three more suits from Joseph A. Bank. When these suits also frayed after a single wearing, he donated them too. He testified that the next summer (2013), he bought three more suits from Joseph A. Bank. And a few months later, he bought the final three suits. According to Lucas, all of the suits frayed after he wore them once or twice. He testified that he didn't complain or return the suits because returning things made him anxious. He maintained that he purchased all of the suits with his Navy Federal Credit Union debit card. (Dkt. 151-1, Ex. B.)

On May 24, 2016, pursuant to a subpoena, Navy Federal Credit Union produced Lucas's original bank statements. The records established that Lucas had made no purchases from any Joseph A. Bank store. Faced with the glaring inconsistency between Lucas's testimony and what the records revealed, plaintiffs' counsel told Joseph A. Bank's lawyers that they were "conferring with Mr. Lucas to figure this out," and surmised that Lucas may have "misremembered the debit card he used." (Ex. A, Tab 16.)

A week later, Daniel Frech, a Spangenberg attorney who had most of the communication with Lucas, alerted Scott and Zavareei to another issue: If the prices Lucas supplied on his alleged bank statement were correct, then he was taxed at 8.75%, which "should mean that he bought [the suits] in the Bay area." (Ex. A, Tab 21.) Frech emailed Lucas: "The tax rate looks like it was 8.75%, which suggest[s] that it was in San Francisco or Santa Clara county. Maybe Marin. Not a lot of places around San Diego have a sales tax rate that high." (Ex. A, Tab 20.)

**C.    The parties file summary judgment motions.**

On June 22, 2016, Lucas and Joseph A. Bank filed motions for summary judgment.

(Dkt. 103 and 106.) Joseph A. Bank argued that Lucas wasn't entitled to restitution, and also maintained that his story was so implausible that no reasonable juror could believe it. Joseph A. Bank identified five problems with Lucas's story: (i) His claim to have purchased twelve-suits didn't make sense; (ii) his Navy Federal records showed no suit purchases; (iii) the Navy Federal records showed that Lucas made purchases in Virginia at the same times in 2012 that he claimed he bought suits in San Diego; (iv) Lucas said he had alterations performed at the stores, but the prices on the statement Lucas produced didn't reflect those additional costs; and (v) the suit prices on the statement Lucas produced reflected an 8.75% sales tax, yet no Joseph A. Bank store in San Diego had a tax rate that high in 2012 or 2013. (Dkt. 106-1.)

Zavareei testified that when he read Joseph A. Bank's summary judgment motion "alarm bells went off." A few days later, Tycko attorneys spoke with Lucas by telephone and although they "still kind of believe[d]" Lucas, stated they didn't feel comfortable going forward with him as class representative. (Ex. A, Tab 28.) Plaintiffs' counsel withdrew their motion for summary judgment, asked for a continuance on Joseph A. Bank's pending summary judgment motion, and moved to substitute a new class representative "to protect the putative class" and because of the "vagaries around the specifics of [Lucas's] purchases." (Dkt. 108-1.) Discovery was closed by then, and the Court denied the request. (Dkt. 113.)

Three days later, plaintiffs' counsel moved to voluntarily dismiss their claims with prejudice and to withdraw from representing Lucas owing to ethical concerns. (Dkt. 116, 117.) At this point, Joseph A. Bank moved for sanctions against Lucas and his attorneys. (Dkt. 132.) They also obtained an order from the magistrate judge compelling plaintiffs' counsel to produce their communications with Lucas. (Dkt. 147.) The Court granted the motion to withdraw and ordered Lucas to: (i) answer some key questions about the alleged bank statement; and (ii) appear at a hearing on October 18, 2016. (Dkt. 123, 128, 150.)

**D.    The sanctions hearing.**

A few days before the hearing, Lucas sent the Court an email explaining that the bank statement he produced had been "faxed" to him. He didn't offer any information about when,

where, how, or from whom he obtained this document. He also tried to blame his former counsel for any misunderstanding that may have arisen.

The Court held the hearing on October 18, 2016. Lucas appeared telephonically from Japan, and advised the Court that he was proceeding without an attorney. The Court placed Lucas under oath and attorneys from both sides, as well as the Court, questioned him. Lucas maintained that the bank statement he provided was legitimate and that his twelve-suit story was true. He admitted that he must have mistakenly purchased the 2012 suits in Virginia, but insisted that he bought the suits in 2013 in California.

While questioning Lucas, Zavareei submitted into evidence an email that he sent to Lucas on July 12, 2016. The letter stated: "We have been doing research on how to proceed based on our conclusion that you have not been honest with us and have been dishonest in your deposition. Despite our numerous calls and requests for clarification, you have not been able to provide any sort of explanation for the facts that indicate you were being untruthful." (Ex. 1.)

Joseph A. Bank called attorneys Scott and Zavareei as witnesses. Scott testified that after May 24, when he became aware of the real Navy Federal records, lawyers with his firm spoke with Lucas and emailed him 13 times. Zavareei said he didn't realize how serious the problem was until he read Joseph A. Bank's summary judgment motion. Both Scott and Zavareei admitted they knew about the tax rate issue before the summary judgment motion. Zavareei also acknowledged that he didn't read Lucas's deposition until months after it was taken.

## II. Standard of Review

**A.   Burden of proof.**

The Ninth Circuit hasn't addressed the standard of proof for sanctions. *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). But most courts that have considered the issue apply the clear and convincing evidence standard. *See, e.g.*, *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995). The clear and convincing standard is a way to protect against "the consequences of grave

decisions too lightly reached." *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 n.5 (9th Cir. 1997). Sanctioning an attorney is a grave decision with serious consequences for his or her reputation. A sanctions motion alone is an accusation with the power to stigmatize. For these reasons, the Court finds that when a lawyer's good name and professional honor are on the line, the party moving for sanctions must provide clear and convincing evidence.

**B.   Section 1927 sanctions.**

Under section 1927, "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The law of the Ninth Circuit isn't quite clear if "recklessness suffices for § 1927 sanctions," *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001), or if sanctions under "section 1927 must be supported by a finding of subjective bad faith." *Blixseth v. Yellowstone Mountain Club*, *LLC*, 796 F.3d 1004, 1007 (9th Cir. 2015) (bad faith includes when an attorney "recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent"). The Court need not resolve the issue because even under the lesser standard of recklessness, there is not clear and convincing evidence that Lucas's former attorneys acted recklessly.

**C.   Inherent power sanctions.**

The Court may also sanction parties or counsel under its' inherent powers when they act in bad faith. *Fink*, 239 F.3d at 994. Here, the Court finds by clear and convincing evidence that Lucas acted in bad faith, and also that he acted intentionally and willfully.

### III.   Findings of Fact

**A.   Lucas's counsel didn't act recklessly.**

Recklessness is "a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation." *In re Girardi*, 611 F.3d 1027, 1038 n.4 (9th Cir. 2010). Attorneys Scott and Zavareei testified that they weren't aware of Lucas's obvious lack of credibility until they read Joseph A. Bank's motion for summary judgment. The Court

credits their testimony, and finds that they acted promptly and reasonably after that point. Within three weeks of determining that Lucas lacked credibility, they moved to substitute a new class representative. When the Court denied that motion, they moved to dismiss Lucas's claims with prejudice, and withdraw from representing him.

**1. Counsel filed suit in good faith and didn't alter the statement to deceive.**

Having considered all of the evidence, the Court finds that plaintiff's counsel initially had no reason to suspect that Lucas – a professional accountant with advanced degrees, a job at Qualcomm, and a wife serving in the U.S. Navy – was lying to them about buying suits. This finding is buttressed by evidence that Lucas produced a phony document to his lawyers to corroborate his account of the purchases. Lucas's counsel were entitled to rely on his representations and the corroborating record he produced.

Although counsel weren't reckless, the Court believes that they should have done more to vet Lucas before selecting him as their class representative. For example, it was sloppy not to nail down Lucas's complete story early on. Basic questions about where Lucas bought the suits and what he did with them should have been asked long before Joseph A. Bank deposed him a year after the case was filed. Plaintiffs' counsel were also somewhat careless in ignoring Lucas's changing story (*e.g.*, first three suits, then twelve), even though they didn't disregard an obvious risk that their client was deceiving them before filing suit.

Joseph A. Bank argues alternatively that counsel should be sanctioned for altering the bank statement and failing to disclose the changes. At the hearing, Scott acknowledged that was a mistake. And it was. But the changes to the phony record were cosmetic, not substantive. The paralegal supplied a missing date by typing it into the document in a noticeably different font. The Court agrees that counsel should have notified Joseph A. Bank about the alteration, but the conduct is not cause for sanctions.

**2. Counsel acted carelessly, but not recklessly, after Lucas's deposition.**

Lucas told a far-fetched story at his deposition. The Court finds that former counsel acted negligently, but not recklessly, in failing to follow-up with their client immediately after his deposition. That's especially true for attorney Zavareei, who admitted that he was

embarrassed that he may not have read the deposition testimony until as late as June 2016. Because an attorney is entitled to rely on his client's sworn testimony, as outlandish as the twelve-suit story sounded, plaintiffs' counsel still had no hard evidence that their client was lying to them and that he had forged the corroborating bank statement until the true and correct bank records were obtained.

But the revelation of the official Navy Federal records four months later should have alerted plaintiffs' counsel that Lucas's account was either mistaken or false. The Court finds it troubling that former counsel filed their summary judgment motion on June 22, 2016—a month after discovering the problems with the bank records that were the linchpin for Lucas's standing.

The Court acknowledges that the missing purchases, standing alone, didn't necessarily mean that Lucas was lying or that he created a false document. The more likely explanation was that he misremembered which account he used. And that's what plaintiffs' counsel initially thought. Frech wrote Scott and Zavareei: "Meaning, unless Lucas is a pathological liar with a penchant for forgery, that he misremembered which account he used to purchase the suits. Or something else is amiss." (Ex. A, Tab 12.)

But Lucas's counsel had also discovered other problems. For example, Frech emailed Lucas on May 31, 2016, that the 8.75% tax rate didn't look right. A month later, counsel told the Court in their substitution motion that, "Plaintiff did not know prior to the filing of" Joseph A. Bank's summary judgment motion on June 22, 2016, "that JAB has no stores in metropolitan San Diego with an 8.75% sales tax rate." (Dkt. 108-1.)

At the hearing, Scott admitted he was aware of the tax issue by June 1, 2016, but said he didn't know exactly where the Joseph A. Bank stores in San Diego County were located during the relevant time frame. He acknowledged on cross examination that he should have taken the time to research the store locations but didn't. Zavareei testified that he probably had some knowledge about the tax issue. Plaintiffs' counsel knew that the City of La Mesa had an 8.75% tax rate during the relevant time, but acknowledged that they didn't follow up to find out if Joseph A. Bank had a store in La Mesa in 2012 or 2013.

These weren't great explanations—particularly after Frech emailed lawyers at Tycko and Spangenberg on June 28 relating, "I looked again just now and can't find any plausible 8.75% taxing jurisdictions in which Lucas could have bought all four of his suits." (Ex. A, Tab 28.) But what that email does suggest is that when counsel filed their substitution motion two days later – claiming they didn't know about the tax problem before June 22 – they made the motion in good faith. Briefs often pass through many word processors. Based on the internal email, and Zavareei and Scott's credible testimony at the hearing, the Court finds the tax rate problem was something that got missed rather than something that was intentionally concealed to mislead. Still, Lucas's counsel should have alerted the Court to the problems with the bank statement.

The Court credits Zavareei and Scott's testimony, which is supported by confidential internal emails, that tends to establish the lawyers didn't appreciate how serious the problems with Lucas's account were until Joseph A. Bank pointed them out. Lucas's counsel didn't act recklessly.

**B.    Lucas should be sanctioned $40,000.**

In contrast to his counsel, the Court finds that Lucas did act recklessly and with the intent to deceive by making up a story that he had purchased suits from Joseph A. Bank, and creating a phony document purporting to prove the purchases that he never made. He compounded these deceitful actions by lying under oath at deposition and during the sanctions hearing before this Court. Lucas defrauded Joseph A. Bank, his own counsel, and the Court from the inception of this lawsuit.

**1.    Lucas wasn't credible.**

The Court finds Lucas's account of the background facts to be incredible. First, his story that he successively purchased defective suits doesn't ring true. The chances of one suit falling apart after a single wearing is slim; to have it happen eleven more times is fantastic. Lucas's story also doesn't match the account he provided during his initial intake conversation, namely, that he bought three suits that incurred wear after a *year*. Ask yourself, after buying three suits from a store and determining they were poorly made, would

anyone return to the same clothing store three more times and spend thousands of dollars to purchase nine more disintegrating suits? At the hearing, Lucas testified that he couldn't recall where he bought these suits in San Diego. He couldn't remember, in particular, if he purchased the suits at the same location all four times, if it was in a shopping center, or if the store was located somewhere along his commuting route between Escondido and his job in San Diego at Qualcomm. The Court finds that Lucas's testimony was false. He didn't buy suits at any Joseph A. Bank store in San Diego at any time.

Lucas also couldn't answer basic questions about the alleged bank statement. For example, he couldn't explain why the prices reflected an 8.75% tax rate, or why his record didn't reflect the alteration costs he said he incurred. At the hearing, he testified that he couldn't recall how he obtained the bank statement. Yet, in the email he sent the Court just three days before the hearing, he stated that someone had "faxed" it to him. He also said other things that weren't true. For example, he testified that when he emailed the alleged bank statement to his attorneys, he included a cover page identifying the financial institution it was from. The lawyers denied that, and the Court finds that Lucas's testimony that he identified the name of the bank isn't true. (*See* Ex. 3.)

Nor did Lucas provide any credible explanation for his failure to figure out where the alleged bank statement came from. The Court questioned Lucas – an experienced accountant – about whether he had taken the basic step of ordering a credit report to identify all possible financial institutions where he may have had accounts. He initially said no, then yes, before finally settling on a story that he discovered three extra cards (Amazon, Best Buy, and Synchronicity). He said that although he tried to obtain records of those accounts, the companies wouldn't produce them for reasons amounting to the dog-ate-my-homework. Lucas's answers at the hearing were hesitant and punctuated with deep sighs. Like his former counsel, the Court concludes his account is dishonest.

The Court finds that the likely motivation for Lucas's false account was money. As the intake memorandum reveals, Lucas seemed extremely interested in becoming a class representative ("YES!") in the lawsuit against Joseph A. Bank. To assure his selection, he

multiplied the number of suits he allegedly purchased, saying initially that he bought three suits for $1,000, then changing the story to claim that he bought twelve suits for $5,000. At one point, he even suggested that he had purchased more than twelve suits – using a credit card that he was "unable to get credit card statements for" because he no longer had access to "that credit card account." (Ex. A, Tab. 2.)  Lucas must have assumed that claiming he purchased more suits meant he would receive more money if he prevailed in the lawsuit.

The Court finds by clear and convincing evidence that Lucas acted in bad faith by intentionally deceiving his lawyers and – initially – opposing counsel about the suit purchases. He also acted in bad faith and with the intent to deceive when he created a fake bank record, and lied under oath at his deposition and during the sanctions hearing. The effect of his deceitful conduct was to sabotage two years of expensive litigation to the detriment of all involved.

**2. Sanctioning Lucas $40,000 is appropriate.**

Faced with the kind of litigation misconduct established here, a court is duty bound to take action to redress it, and to try to deter future misconduct. To do nothing, or to simply dismiss a case under aggravated circumstances like these, creates a risk that courts will be viewed by unscrupulous litigants as an organ for committing fraud. With that said, the Court is also aware that when it exercises its "inherent sanctioning power" it must do so in a way that "tailor[s] the sanction to the particular wrong." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 56 (1991). "Hence, a court can properly consider plaintiff's ability to pay monetary sanctions as one factor in assessing sanctions. It cannot, however, decline to impose any sanction, where a violation has arguably occurred, simply because plaintiff is proceeding *pro se*." *Warren v. Guelker*, 29 F.3d 1386, 1390 (9th Cir. 1994).

At the hearing, Lucas testified that he didn't know his net worth. He said he earned income from a home he owned in Virginia, and that he had about $25,000 equity in the house. He also testified that he owns a car and he has about $30,000 in savings. Based on this accounting, incomplete as it may be, the Court finds that Lucas can afford a monetary sanction of $40,000. That's a fraction of what Joseph A. Bank spent, but it's an amount that

is proportionate to what Lucas can pay and to the reprehensibleness of his conduct.

## IV. Conclusion

Ben Franklin said it takes many good deeds to acquire a good reputation and only one bad deed to lose it. That's especially true in the legal profession. The Court is reluctant to sanction attorneys who were intentionally deceived by their client—although, as recounted here, that doesn't absolve them completely. As experienced class action litigators, counsel should have more thoroughly vetted Lucas's account, and should have promptly investigated his changing stories. But ultimately, the Court finds there isn't clear and convincing evidence that the attorneys multiplied the proceedings "unreasonably and vexatiously." In other words, plaintiffs' counsel didn't act in bad faith or recklessly by failing to dismiss the case sooner. Lawyers must give their clients the benefit of the doubt and act circumspectly before abandoning them or their cases. That's especially true in situations like this one, where the interests of a putative class were also at stake.

David Lucas caused Joseph A. Bank to needlessly expend a substantial amount of money. He's done a disservice to many other citizens who faithfully and with good intentions turn to the Court to help them reliably and honestly resolve their disputes. His conduct is sanctionable. The Court orders Lucas to pay Joseph A. Bank $40,000.

**IT IS SO ORDERED**.

DATED: November 15, 2016

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge